Mr. Collins. Good morning. May it please the Court. Todd Collins, Berger-Montague in Philadelphia. I'm here appearing on behalf of the appellants. Respectfully, I've requested five minutes for The Third Circuit Court of Appeals rendered its opinion in the Suida v. University of Pennsylvania case. Plaintiffs provided a notice of supplemental authority a few days later. This is a very important case for the present purpose. First of all, it reaffirmed the very important concept that it's important to employ a holistic approach considering all the well-pled allegations in a case of this sort. In so ruling, Suida followed this Court's ruling in Braden v. Walmart. Holistic evaluation of allegations is required. The complaint should not be parsed piece by piece to determine whether each allegation in isolation is plausible. Can I press you on that? Because that was one of my questions on this case is what do we do if the allegations are somewhat independent? So, for example, the allegation about the retail versus the institutional shares is somewhat independent of the others in the sense that it's a little different than the allegations that were made, for example, on record keeping and other such things. Do we have to view those separately or do we view the whole complaint as a whole? Respectfully, Your Honor, you review it all as a whole. I'll take an example. The case law here and elsewhere is quite clear that there's no breach of fiduciary duty if the only thing the fiduciary did was not choose the lowest price alternatives for a particular investment or a array of investment options. What you need to do is look at every single aspect. Here, as I'm going to go through in a moment, if I may, there is a range of issues that indicate that fees were too high and that the particular investment options were imprudent. Respectfully, I think you need to look at all of those allegations because, frankly, Your Honor, it really is the case that if we came here only because there were two record keepers rather than one, that might not be enough. But in context, we submit it is. Now, in Sweden, as this Court is aware, there was a reversal and remand with regard to Counts 3 and 4, which concerned breach of duty . I'd like to run down what those claims are that were cited in the Sweden opinion, and I'd like to also point out where in our complaint we set forth those same allegations. At page 330 of the opinion, there was the allegation that the defendants are responsible for hiring the record keeper and for record keeping compensation in our appendix, which starts with the complaint. At page 19, AA19, there's the same allegation. Defendants are responsible for menu options. Again, page 330 from Sweden, pages 13 and 14 of the appendix. If I could interrupt just for a minute. Please. Even if the claims are the same, it seemed to me that what Sueda was doing was really looking at the factual allegations underlying it such that there had to be enough there at the time these decisions were made that you could make an inference that there was this breach of fiduciary duty. Is that more the difference between this case and Sueda or potential difference than the actual claims that are alleged? Your Honor, it certainly is something that this court, I'm sure, will focus on, but there is not really a difference. For example, one of the things that the Sueda court pointed out was that there were specific charts provided in the complaint supporting the allegation of the plaintiffs in the complaint that the TIAA real estate account and the Kraft stock account were not only very costly, but also underperforming. So there were charts in the complaint which supported that allegation, and we have those same tables or similar tables in our complaint at AA 47 to 51 for the Kraft stock account and 54 to 55 for the TIAA real estate account. So I think it's absolutely right. The courts are completely clear that one can't just say you violated ERISA and set forth the elements of a claim and leave it at that. You need to provide support. We have done so, and in addition to that, Sueda did so, which I think is why the complaint survived at the Third Circuit. Help me understand what you think the nature of those facts are, because at least in the cases we have in this circuit, it seems to be that we haven't really found, a case hasn't proceeded without some kind of malfeasance, without some kind of wrongdoing, kickback, something like that, that's been alleged. And if I'm wrong, if there's a case in the Eighth that has survived without that, I'd be interested to know what those factual allegations are. Your Honor, there was absolutely some element of wrongdoing that had to do with perhaps a breach of the duty of loyalty in both, certainly in Tussey. Whether there was in Braden is a little less clear. In Braden, as the Court is aware, there was an allegation that there were kickbacks, which were an ugly idea, a kickback. But what a kickback really means is that the revenue sharing gets paid to the record keeper. And so that it's not, the decision wasn't made for the benefit of the plan, is the allegation. Well, if your question is intent, the real point here is that ERISA, of course, forbids a breach of the duty of loyalty, lining your own pocket at the expense of the participants. But in addition to that, there's the duty of prudence. And what we're as in Sweden, where there was a breach of the duty of prudence to the extent that there wasn't an eye single on the best interests of the plan participants, but instead there was negligence, there was laxness, there was a number of motivations which we would need to explore in discovery. But at the pleading stage, what we need to do, and what I think we have done, is set forth allegations that are well-founded for which we provide support to the extent that that support is available to us before discovery, to substantiate the idea that this is not a breach of the duty of loyalty case, but instead a breach of the duty of prudence. And that, under all interpretations of ERISA, is enough, even if in TUSSE, for example, there was also an intent, at least apparently, for the fiduciaries to benefit themselves and the company. Let me ask you, on this breach of the, on the underperforming TIAA real estate account, and I think you also had one in the Vanguard account, what is the university to do in that situation? Let's say you have, I think Vanguard, you had 80 investment options, TIAA, CRAF, you had 35. Yes. And let's say in TIAA, CRAF, 33 are at or above the benchmark for comparable funds, but you've got two that aren't. Right. Should then they go out then and say, okay, well, now we're going to give you fidelity for those two funds. Do you add another whole different, I mean, at some point it becomes almost unwieldy if you say, okay, we're going to give two funds for fidelity, 33 for TIAA, CRAF, 80 for Vanguard. Absolutely. That's what you say they have to do. No, respectfully, no, your honor. In fact, that's part of the problem in this, in this plan, that there are too many options and it's confusing and they are not finance professors, most of them from WashU who are the participants. Instead, it needs to be understandable to all types of people, including people who are not conversant in the markets in terms of how to, to invest. What happened here, as we allege in the complaint, is yes, we are only attacking two out of 90 or 100 investment options, but it's important because those two consumed 20% of the assets, of the total assets in the plan. And that's, that's one of the reasons why this case is different from the Renfro case in the third circuit, which was criticized and limited in the Suida case that just came down in the third circuit. It's not enough just to, you can't insulate yourself from liability just by adding another 10 or 20 or 350 investment options. You have to look at each individual investment option. Now, so you're saying they shouldn't have a real estate option. I'm saying that they, they, again, it's in the discretion of the, of the fiduciary. It's not for, for any lawyers to say, except they can't get it wrong. And in the case of the TIA real estate account, the, the costs were extreme and the performance, at least according to the facts, as we are aware of them, indicated that they had vastly underperformed. The only benchmark that is really out there, which is a Vanguard REIT index. I will say one more thing about the TIA real estate account is it is, it is an investment option that requires a particularly large amount of scrutiny by any planned fiduciaries because it's so unusual. It actually goes out and buys real estate. It has all sorts of weird charges, such as, for example, because prohibited transactions would be involved in connection with certain real estate transactions that, that the, the fund undertakes, there has to be an independent fiduciary hired to sort of pass over those, those transactions. And we think, quite unfairly, the cost of the independent fiduciary is borne by the participants in a much higher fee for investing in this, in this particular investment. So what about counsel? What about the value of diversification, right? Because yeah, maybe there's too many funds, but perhaps you have certain participants who need or think they need to diversify by including some real estate holdings because they don't own their own house, for example. Yes. And so therefore, they want an additional fund. I mean, I don't know that this really accounts for the fact that the menu of options may be to allow the participants diversify. Your Honor, we are all in favor of diversification and this, this does, this plan does provide diverse investment options. However, it is not permissible in an effort to diversify to include an imprudent investment. And that's what the TIA real estate investment is. An option, up to the fiduciaries, of course, but an option would be the Vanguard REIT, which we refer to in our complaint. There are other options. What time frame are we talking about? Because what happens is, is, you underperform for a period. Perhaps they have a bad manager for two or three years. Yes. The manager moves on or the manager gets fired. They put in a new manager. Their manager does a great job. So often underperforming funds become overperforming funds. That happens. And so at what point does it become imprudent in your mind? Well, in our, I mentioned that we have charts in the complaint which, which compare the, the stock account, for example, to other comparable investments. We look at 2009, which is two years before the beginning of the class period. And we look again at 2014. How much is, how far back is, is far enough? I mean, I imagine that's beauty in the eye of the beholder, but I think it is important to avoid just what you suggest, Your Honor, which is for a plaintiff to file a complaint because at, at, at one particular three-month or six-month period, there's underperformance. We have alleged much more than that. We've alleged not only excessive cost, but also historical underperformance. Now, Mr. Ortelier may come up and say, oh, no, no, plaintiffs have it all wrong. Look at our chart. Don't look at plaintiff's charts. Well, our charts are correct, Your Honor, Your Honors. I'm sure Mr. Ortelier has a basis for his charts, but that's the essence of a factual dispute. Your Honors, I can go on, but I don't mean to bore the court. And I'm running out of time about all the ways in which our complaint has the same allegations and Judge Kelly, the same support for those allegations as in the We talked about that case. What about the Seventh Circuit cases in particular? I think there's one by Judge Easterbrook that seems to cast some doubt on, on, on whether this case should go forward. Any response to that case? Yeah. Well, there are three cases that the defendants rely on in particular. And, um, with regard to those cases, um, uh, forgive me. With regard to those cases, which are, uh, Hecker One, Loomis, and Renfro, um, I believe, Your Honor, you're referring to the Loomis case, right? Um, uh, a few things. First of all, all of those cases focused on the array of, um, uh, investment options, not just particular investment options. And we have, with regard to one of our two counts focused on two underperforming, two expensive investment options, real estate stock account, as we discussed. The second is, um, that all of those cases say, uh, that they are limited to their facts. And one of the things that the Suita Court said that's very interesting is it said, forgive me, at page, uh, 330, I believe, that it's very important that you realize that under the and monitor fees, um, uh, in the quote, circumstances then prevailing. And in the criticism of the, um, the, the Hecker case, which is very similar in holding to the Loomis case, uh, uh, one of the things that, um, the court did was to point out that what might have made sense, um, to the earlier panel, things change in the markets and it's important for the, there not to be bright line tests that don't necessarily, uh, change depending on circumstances. So yes, those three cases, um, uh, provided what they, they, that held as they did, our case is distinguishable. And I think the Suita opinion has, has, has indicated the right way to go in the particular circumstances of, that we find ourselves here with a 403B plan, um, uh, which is very similar in its faults and its difficulties to the Suita plan. Thank you. Please. Thank you. Mr. Ortelier. May it please the court. My name is Brian Ortelier and I represent Minneapolis. I think a brief roadmap to my argument, very brief, um, is useful. I submit, there's three questions really before this court. And as I think judge Kelly alluded to a moment ago, there really is a threshold question is eighth circuit law, um, different here. And I note, and I'll talk about this in detail in a few moments that, um, this court has three times applied the standard of review or the, the rule set forth in the seventh circuits, HECR opinion, the reasonable array test. And that speaks to, or governs the two claims, the excessive fees and share class claims. Second, of course, I guess the elephant in the corner, the pen ruling. Um, I submit that the pen ruling is based upon a standard of review entirely at I'll talk about this again in more detail. Um, and Mr. Collins alluded to this, this court in Tussie set forth an abusive discretion standard to these sorts of claims. And remarkably, and this surprised me at page 11 and Mr. Collins has touched upon this. The plaintiff submit that the full measure of discretion is afforded to these fiduciaries in the decisions they make, which means under Tussie deferential judicial review. And I'll tie up that loose end in a few minutes, save the thought. Also the discrete fund claims, minors, this court's more recent opinion is I submit a game changer. And what is the standard, the plausibility standard under Twombly after this court's minors opinion. Um, by the way, I submit generally, we're not asking for much, just simply that Twombly's pleading standards applied to ERISA claims mindful of this court's opinions in Braden, Tussie and minors. And also all should keep in mind sort of the context specific scrutiny that Dudenhofer calls for on 12B6. Courts are to weed out Maryland's goats. Anyway, there's two critical concessions in the plaintiffs, um, that the plaintiffs have made, that I think are absolutely mission critical here when considered next to Braden, Tussie and minors. Okay, the first concession, and I'm going to submit a couple of background, um, points really set out in the complaint. The Wash U plans a participant directed retirement savings plans. The participants of course determine, they make the risk reward calculus, they look at the fees and they determine how to invest their money across the 119 different offerings. Now, it's not seriously in dispute that the lineup offers or reflects the entirety of the risk reward continuum and the fees, and I'll talk about this more in a few moments, are as low as four basis points, the cheapest fund on the lineup. Now again, the plaintiffs make the determination how to invest their retirement dollars, and along the way that establishes the amount of revenue sharing paid to the record keeper, which is a perfectly lawful arrangement or means of compensation, and very common as this court observed in, um, Tussie. Now, this is critical. The district court specifically held that the plan affords participants a reasonable array of investment options consistent with the Seventh Circuit's opinions in Hecker and Loomis, and observed that this lineup is better than all of those cases to which the district court, um, pointed. As I noted, there's the cheapest fund offering is four basis points. We have 47 funds lower than 10 basis points, and by the way, um, talk about this more in a moment, there are 78 options at or below 30 Brayden. Now, plaintiffs don't challenge that. This is step one, nor could they, but given, again, the mission critical role of the individual participants, this is the threshold question. Can they create a diversified portfolio at low cost, um, if so inclined? Now, there's a second, uh, and I touched upon this and I won't belabor the point, but again, while you're on the question of fees, let me, let me ask you this. Um, one of the arguments that the appellants make, and I'll be frank with you, one of the ones I would be most concerned about is that when the university had the option of paying either retail or institutional fees, and the institutional fees were less than the retail, they didn't select the institutional, and that came straight out of the participant's pocket. Now, what's the justification for paying retail when you have the institutional option? Um, your, your honor, Mr. Collins spoke to a holistic, um, look at the complaint. I submit that the governing case law requires a holistic look at the way the plan works. I'm getting to your question. But why? Why when it's, when you get, when, if, if, if the plan, if, if Vanguard says you can pay four basis points or you can pay 10 basis points, why would you ever choose fewer? Here's why, your honor. It's the, it's the aggregate of the revenue sharing that is determined by the fund lineup that's paid to the record keeper. And the reason for the reasonable array inquiry is that some funds pay more, some funds pay less. By the way, the participants at the end of the day decide where to put their money. But you really can't, under the reasonable array test, look at a fund in isolation as the plaintiff suggests, because it's the aggregate of the funds or stated differently. What they're asking this court is to sort of pluck out particular funds and the retail institutional distinction, which by the way, all of the funds in HECR were retail funds. It matters because it's the totality of the compensation to the record keeper. And you really can't, and for good and abundant reason, just point to a couple of funds and say, these are too pricey. Because the actively managed funds, for example, at the high end of the cost spectrum, sort of, again, you're bringing all these sophisticated investment advisors, and make no mistake, the varied interests of the different participants, yes, we have university finance professors who want to pay that money, the more expensive offerings, in pursuit of their own individual diversified portfolios. But aren't there, to get to his, I want to get to, I think, the point that Judge Malloy is asking about, aren't there different inferences that can be made or come out of that, which is, it could well be that some of the non-finance professors and bureaucrats at Wash U just were lazy, or they were incompetent. That's one inference. Another inference is the inference you're drawing, just from the complaint, which is that you needed to do that to adequately compensate the record keeper. That's the deal they struck, that's the deal they needed to strike with Vanguard and TIA, Kraft, et cetera. Let me just take one step back, and again, absolutely critical. As Mr. Cummins, I think, twice acknowledged, we're talking about under TUSSE, and given the admission about the discretion afforded the participants, there are myriad decisions taken together that make up how this plan is designed and how it works. And the question really is, is there an abusive discretion at the end of the day? Your Honor pointed to the opinion, sort of front and center to the plaintiff's claims here, is that Wash U should be using a per capita approach for assessing fees, rather than the asset-based revenue sharing approach. And what Judge Easterbrook, excuse me, pointed out, importantly, in applying an abusive discretion standard, in these plans, the per capita approach imposes a severe penalty to small account participant balances. So the idea is, if you take the step back, which again, page 11 of the briefs, Mr. Collins says it again, you apply abusive discretion, is this within the range of reasonableness? It's not our duty to have to optimize these plans and along the way, invite this court effectively to rewrite the plan. But if the reason for it is incompetence, because they were too lazy to negotiate for the institutional shares, shouldn't the complaint go forward? But that's the point of the reasonable array approach, which again, this court applied in Braden, TUSSE, and Miners, is that there can be no inference. What we're talking about, plausible claims under Twombly, there's no inference of a misstep or a failure at the threshold, given what you've done is you've created this diverse array and afforded and empowered the participants. Well, let me ask you this. Suppose there is, let's just take Vanguard. Vanguard has admiral shares, which are sort of the institutional shares, and they have regular retail shares. Let's say that 100% of the shares, and this isn't the case in Wash U's plan, were retail shares, and you look at peer institutions, and 100% of them were in admiral institutional shares. Why wouldn't you draw an inference that the people at Wash U are incompetent by not getting admiral shares? Because again, what the case law demands, and Hecker is the seminal opinion, there is this range established of reasonableness. We're way off the low end of that. In other words, this array, and again, I can imagine you could posit any hypothetical plan, but really then the question turns to what's the array? And if you fall off at typically the high end, there is a problem. But the point of these sorts of cases, I argued both Hecker and Suida in the third circuit, the point at the end of the day is there cannot be a plausible allegation of the misreasonable array. You're not answering the question. If you're just leaving money sitting in the field, all you've got to do is go pick it up. Why isn't that imprudent? If under Vanguard, as Judge Strauss says, they've got the admiral, and I'm in Vanguard, so I know once you hit a 500 index fund, and you can either pay 10 basis points as an institutional investor, or you can pay four basis points, or excuse me, the other way around, four basis points as institutional, 10 as retail, and you qualify for the four, why wouldn't you just go pick up the money? I'm sorry, and I'll answer your question. There's no free lunch. In other words, there will be, in many instances, again, I don't think the Wash U plan is any different, there will be retail share class funds to spit off more revenue sharing to pay the record keeper. You can't drive all these funds to four basis points. Then there's no money at the end of the day to pay the record keeper. It's the discretionary judgment, which the Tussey case celebrates or points to, to use revenue sharing, which is lawful and legal. Then each part of the plan becomes part of the quantum of compensation paid to the record keeper. You can't just simply say, well, Vanguard has the admiral share class. Why didn't you move to that? Well, you are constrained in part because the record keeper needs to be paid. That's why the courts, and again, the threshold question is, is the array reasonable? By the way, and again, Brayden is important here, because Brayden, and we went back and studied- Before you move on real quick, no, no, it's fine. How do we know that just from the complaint? So I'm sure you have evidence that you can prove this. You can prove that you need the retail share to the record keeper. That might be developed at trial or whatever, but the complaint, I mean, we have to draw inferences in your favor, potentially, because I don't see that in the complaint or any of the documents that are sort of a part of the complaint. I think that what is in the record are each of either the fact sheets or prospectuses that sell out the array of investment offerings. And by the way, the plaintiffs first raised in their reply brief that somehow it was an abuse of discretion for the court to take judicial notice of that. The argument was waived, but more importantly, this court in minors made it specifically held that these types of documents, excuse me, are fair game. By the way, the plaintiffs don't dispute sort of the array or the workings, the expense ratios that I just described in part. They're all in the public domain. Anybody can go on the internet and find them, but they're also in the record and they're properly the subject of judicial notice. Is there a page or something in a prospectus or is there somewhere we would look in a prospectus to see exactly what you're saying, that the record keeper needs to be paid? Typically, you'll see a bullet heading and it says fees and expenses. And what the expense ratio, I think the SEC requires them. So long as you're not dealing with a separate account, a slightly different investment vehicle, it's right there. I mean, they're prominently sort of displayed or emphasized. And the reason why I think both of us are pressing, or at least I'm pressing you on this issue, is because minors talks about the benchmark. And one easy benchmark, and you can disagree with me, but if you have an institutional share and you have a retail share, that seems to me to be a pretty easy benchmark. One's four basis points, one's 12 or 10. You can make those comparisons, whereas there's some other claims where you might have a problem with the benchmark. Well, let's pause for a moment. And there's sort of two things going on here. And I think it's also time I talk a little bit about the discrete investment claims, because these things are a little bit different. At the threshold, and again, you look to see whether there's a reasonable array as measured by the prior case law. We're way off the low end. I think we have something like 60 funds that are below the 30 basis point of Braden. So the first question is, do you have the reasonable array? They don't contest that. Then you roll into, and as I think the panel referred to previously, is there some allegation of wrongdoing or misconduct? And that's in Braden, but made more explicit, I think, in Tussey. There are no such allegations here. So again, there's no plausible sort of allegation that somehow these fiduciaries are asleep at the wheel. They're killing it, especially when you look at Braden as a starting point. But again, when you look at the array, it's a holistic look at the plan. And Judge Easterbrook explains this with precision and sort of all the fundamental finance considerations and larger economic considerations, why this makes abundant sense. I commend the opinion to your reading. But I think with the little time I have left, I'd better talk about the discrete investment claims. Again, and I think it's been touched on a little bit here, plaintiffs allege that the inclusion of three of the, I think it's 119 funds, were breaches. This is important and critical under this court's opinion in minors. The three challenged investments, the TIA real estate account, the TIA traditional annuity, and the CREF stock account are annuities. Now, these are not run-of-the-mill mutual funds. They seek to ensure a stream of payments at retirement. And by the way, Congress encourages the offering of these products. If you look at the revenue code, Section 403B, this is a 403B plan, these are described as an annuity plan. Only recently have they started rolling out mutual funds. But in the first instance, Congress wanted to see these types of plans in this really nonprofit space. Importantly, as we say in the front of the brief, recently, the Department of Labor has initiated an effort, a regulatory effort, again, to encourage the offering of these annuity products. Now, there's a robust market for these things. And if you roll this all together and you look at minors, the task, and we're talking about, never lose sight of that, all of these cases, we're talking about 12B6 and the application of Tuomaly. What you have to do here, they have to benchmark these challenged products against other similar annuity products to get to square one. Again, minors, and it's worth talking about for a moment, and this court went on to say, in minors, what is a meaningful benchmark? First, it's what I can't just sort of randomly select a benchmark or another fund. Otherwise, you're opening the floodgates to these types of lawsuits. The plaintiffs could manufacture no small measure of additional complaints pointing to anything they want. Again, on 12B6, you look for the meaningful benchmark. Now, Tussey says, we look at these issues for an abuse of discretion. They admit that, page 11 of their brief. They have offered no meaningful annuity comparators under minors. They're all over the place. And by the way, I heard criticism of sort of certain fees that are embedded in one of these annuity products. As this court observed in Tussey, it's not sort of the discrete investments that make up the entirety of the sort of fees charged. By the way, Your Honor, again, this is all in these expense ratios. But as Hecker in this court in Tussey observed, it's not the discrete fees, it's the bundle. It's the entirety that's relevant. Now, I say further, there was a lengthy trial in the Southern District of New York, and that court held, citing to this court's opinion in Roth versus Sawyer-Cleter, that these investment offerings are objectively prudent. Now, what Roth versus Sawyer-Cleter, and it's not in my brief. I only spotted this, and I thought I wrote the site down, but I don't have it handy. Roth versus Sawyer-Cleter explains the concept of the hypothetical prudent fiduciary. In other words, if in fact, and we don't concede this for a moment, there's some Roth versus Sawyer-Cleter, there can never be a finding of liability. And what that court held was these challenged investments were objectively prudent. And I'll submit, I'm not sure, when you look at objective prudence, and this court has a good deal of case on the hypothetical prudent fiduciary principle, I'm not certain you could point to a better example after a lengthy bench trial of a finding of objective prudence. Now, the NYU Sasserdoti litigation's on appeal, admittedly, but given, I think, what are the Second Circuit's deference to these factual findings, I suspect it's not going to be overturned. Counsel, I want to ask you, suppose that we think that there's, that one of the sort of subclaims, I would call them, survives. So, for example, let's say we think the institutional versus retail share survives, or should go forward at least to summary judgment. But perhaps the others don't have as much merit. I ask opposing counsel this, do we have to allow the entire claim to go forward, in your view, or just the portion where there's an inference of imprudence? I'm sorry, you're asking me, do we have to let the entirety of the claim go forward? If you're inclined to agree with me, I think, can I restate the question just so I see that? Well, yeah, as long as you don't restate it in a way that changes the question. I'm not trying to, I'm genuinely trying to follow you. So, if in fact some aspect, and by the way, yes, what we say is that the reasonable array test, and if I'm getting far afield, Your Honor, you tell me. The reasonable array test of Hecker, Braden, Tussey, and Miners requires, at the end of the day, the dismissal of the share class claim and the record keeping claim. So, I think my position is, it's all or nothing, but I'll take anything I can get. Fair enough. Respectfully, I submit that the district court's opinion should be affirmed in all respects. Thank you. Let's go back to Braden quickly, if we may. I believe to the extent that Mr. Ortelier would want to have the court consider inferences favorable to the defendant with regard to how can you possibly retain retail classes when institutional shares are available, Braden instructs otherwise. The district court erred in two ways. It ignored reasonable inferences supported by the facts alleged. It also drew inferences in Appellee's case. That's not our job. Before you move on, there is one part of your complaint that potentially contradicts the institutional versus retail shares claim. That is, you talk about the fact that schools have been moving towards institutional shares. Something changed in 2009. Regulations changed. Schools moved towards institutional shares. Then you look at the prospectuses and the change in these shares, and Wash U has followed that. Wash U, there are more institutional shares now than there were in 2009. So what do we make of that? Your Honor, what I make of that is, what in the world are they doing? They have seen the light. They understand they have to shift from retail to institutional, but it has taken them up until 2017, and I believe we allege in our complaint as late as 2017, they still had six or more Vanguard funds that they hadn't shifted. So it's not fast enough. It's not fast enough. And beyond that, Your Honor, the very fact that they shifted some from retail to institutional shows that they acknowledge, they understand it's important, and yet they haven't done it. At the district court level, the Tibble case found, they had a trial. It was a different situation, but there was a discussion as to whether the transfer could be made in two to five months, and the court said that's too slow. It can be done faster than that. Your Honor, these are very important issues. I would urge the court, since I'm now out of time, to look at the Tibble Court of Appeals ruling at page 1198, talking about how critical it is, what the fee level is, and for Mr. Ortolero to say or suggest maybe this is not such a big issue. It's just a few basis points here and there. We have a retirement crisis in this country. It is very important that the expenses be as low as possible, as the Tibble Court pointed out. Just one last word, and then I'll sit down if I may. I will point out that we didn't talk about the traditional annuity, and the defendants have never refuted our argument that the traditional annuity is in violation of 408B2 because it violates the rule that any termination fees have to be reasonable, which is not the case here. Obviously, this case is flooding with factual issues that we need discovery on. Thank you. Your Honor, just something to stress at this site, and when we found it, it's paragraphs 43 and 96 of the complaint, and there the plaintiff's acknowledged that institutional share class funds don't pay revenue sharing. Thank you. Thank you both for your argument and your briefing. It's an interesting case, and we'll take it under advisement.